Filed 3/17/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| SETAYESH PADIDEH,<br><br>  Plaintiff and Appellant,<br><br>  v.<br><br>RAMIN MORADI, D.D.S., et al.,<br><br>  Defendants and Respondents. | H048130<br>(Santa Clara County Super. Ct.<br>No. CV292889) |

The defense of unclean hands may be raised in an action, such as this one, for malicious prosecution. (*Kendall-Jackson Winery, Ltd. v. Superior Court* (1999) 76 Cal.App.4th 970, 986 (*Kendall-Jackson*).) "The doctrine demands that a plaintiff act fairly in the matter for which [they] seek[] a remedy. [They] must come into court with clean hands, and keep them clean, or [they] will be denied relief, regardless of the merits of [their] claim. [Citations.]" (*Id.* at p. 978.)

This consideration outside the merits of a plaintiff's claim reflects that one beneficiary of the unclean-hands doctrine is the courts, as its application "protects judicial integrity and promotes justice. It protects judicial integrity because allowing a plaintiff with unclean hands to recover in an action creates doubts as to justice provided by the judicial system. Thus, precluding recovery to the unclean plaintiff protects the court's, rather than the opposing party's, interests. [Citations.]" (*Kendall-Jackson, supra,* 76 Cal.App.4th at p. 978.) The doctrine "is not a legal or technical defense to be used as a shield against a

particular element of a cause of action. Rather it is an equitable rationale for refusing a plaintiff relief where principles of fairness dictate that the plaintiff should not recover, regardless of the merits of [their] claim. It is available to protect the court from having its powers used to bring about an inequitable result in the litigation before it. [Citation.]" (*Id.* at p. 985.)

Although the venerable unclean-hands defense has been described in many iterations, courts have developed and now consistently apply a "three-pronged test to determine the effect to be given to the plaintiff's unclean hands conduct. Whether the particular misconduct is a bar to the alleged claim for relief depends on (1) analogous case law, (2) the nature of the misconduct, and (3) the relationship of the misconduct to the claimed injuries. [Citations.]" (*Kendall-Jackson, supra,* 76 Cal.App.4th at p. 979.)

Analogous case law here, such as *Kendall-Jackson*, makes clear that the unclean-hands defense is, as noted, available in malicious-prosecution actions. As to the second prong—the nature of the misconduct—a plaintiff's actions giving rise to the unclean-hands defense "need not be a crime or actionable tort. Any conduct that violates good conscience, or good faith, or other equitable standards of conduct is sufficient to invoke the doctrine. [Citations.]" (*Kendall-Jackson, supra*, 76 Cal.App.4th at p. 979.) As to the third prong—the relationship of the conduct to the claimed injuries—the unclean-hands conduct need not relate directly to the malicious-prosecution defendant's decision to file and pursue the prior litigation. (*Id.* at p. 987.) But it "must relate directly to the transaction concerning which the [malicious-prosecution] complaint is made. It must infect the cause of action involved and affect the equitable relations between the litigants. [Citation.]" (*Id.* at p. 984.) Still, the defense "goes beyond the justification for filing the malicious prosecution suit; unclean hands

2

concerns the far broader question of a party's misconduct in the matter. [Citation.]" (*Id.* at p. 986.)

Plaintiff and appellant Setayesh Padideh[1] brought this action for malicious prosecution against defendants and respondents Ramin Moradi, D.D.S. and his attorney, Ali Kamarei, Esq., dba InHouse Co., after Padideh prevailed in the underlying action when the trial court sustained her demurrer to Moradi's second-amended cross-complaint (cross-complaint).[2] Moradi and Kamarei asserted the unclean-hands defense in this action based on Padideh's alleged misconduct in the Underlying Action—testifying falsely at her deposition. Because of that deposition testimony, they made the strategic decision in the Underlying Action to abandon pursuit of Padideh as a cross-defendant. Acting on that decision, they did not challenge the court's tentative ruling sustaining her demurrer to Moradi's cross-complaint or amend the pleading to the extent leave to amend had been granted. And they made no settlement demand in exchange for Padideh's clean exit from that case.

After the trial court in this later case determined in bifurcated bench trials the malicious-prosecution elements of favorable termination and lack of probable cause in Padideh's favor, a jury was tasked with deciding the remaining elements of malicious prosecution—principally malice and any

---

[1] This action names the plaintiff and appellant as Setayesh Padideh, though there are indications in the record that Padideh is her first name, not her surname. But to avoid confusion, we refer to her as Padideh as if that were her surname as that is the most frequent usage in the record and briefing in this case. We mean no disrespect in doing so.

[2] The underlying action was filed in the Santa Clara County Superior Court in June 2015, by Padideh's husband as plaintiff and was entitled *Ali Heidari, D.D.S. v. Ramin Moradi, D.D.S.* 2015-1-CV-281836 (Underlying Action).

damages—and the unclean-hands defense. The jury determined that Padideh "ha[d] unclean hands," barring her recovery in this action. Judgment was later entered in Moradi and Kamarei's favor.

On appeal from the judgment, and after unsuccessful motions for new trial and for judgment notwithstanding the verdict (JNOV), Padideh challenges the application of the unclean-hands defense here, contesting the showing for all three prongs of the test. We conclude that all three prongs were met, as a matter of law on the first one and as supported by substantial evidence on the remaining two. We further hold that a defendant asserting unclean hands in defense to a malicious-prosecution action need not demonstrate additional harm or prejudice as part of or in addition to the third prong addressing the relationship between the misconduct and the claimed harm—that absent the misconduct, they would have prevailed in the underlying action.

We accordingly affirm the judgment.[3]

---

[3] On the eve of oral argument in this case, Padideh filed a request for dismissal of the appeal "as to respondent [Moradi] only," with these parties "bear[ing] their own respective attorney's fees and costs on appeal." (Capitalization & boldface omitted.) We infer from this that Padideh and Moradi entered into a settlement of the action as between them, leaving Kamarei as the sole party respondent on appeal. Based on this request, we exercise our discretion under rule 8.244(c) of the California Rules of Court to dismiss the appeal as to defendant and respondent Moradi and direct the immediate issuance of the remittitur as to him, only.

4

STATEMENT OF THE CASE

I.    *Relevant Factual Background and the Underlying Action*[4]

"Dr. Ali Heidari and Dr. Ramin Moradi are dentists and were 50-50 shareholders in a dental practice known as Ali Heidari, D.D.S. & Ramin Moradi, D.D.S., Inc. a Professional Corporation . . . located in Aptos, California [(the Corporation)]. Dr. Heidari is married to [Padideh], plaintiff in [this] case. [¶] A dispute arose over the sale of the Corporation, and Dr. Heidari filed a complaint against Dr. Moradi for declaratory relief, specific performance[,] and breach of contract . . . . Dr. Moradi filed a cross-complaint against Dr. Heidari claiming, among other things, that Dr. Heidari [had] fraudulently misappropriated over $1.7 million . . . from the Corporation." (Fn. and some initial caps omitted.)

"On October 26, 2015, Dr. Moradi, through his new counsel, Ali Kamarei, Esq., filed a . . . cross complaint . . . bringing in two new parties: Dr. Heidari's wife, [Padideh], and the Corporation. [¶] The . . . cross-complaint named [Padideh], together with her husband, . . . in the fifth and sixth causes of action. The fifth cause of action allege[d] a fraud claim and the sixth cause of action was for voidable transfer [under the Uniform Voidable Transactions Act (UVTA, Civ. Code, § 3439 et seq.)]."

According to Kamarei, he had recommended to his client, Moradi, that Padideh be named as a cross-defendant in the Underlying Action because of the following perceived facts or conclusions he had reached from information gathered from either Moradi or Moradi's wife (also a dentist), as summarized:

---

[4] We take the background facts from the jury trial testimony, the trial court's written statement of decision after the earlier bench trial on the bifurcated issue of probable cause, and the trial court's order on demurrer in the Underlying Action. No reporter's transcript from the prior bifurcated proceedings in this case appears in the record.

- the high dollar amount of the funds seemingly transferred or diverted from the Corporation's bank accounts without Moradi's knowledge or consent ($1.7M);

- that funds appeared to have been transferred online or wired to and from multiple bank accounts belonging to Heidari to which Padideh as his spouse likely had access;

- that some of the diverted funds were transferred to and from an equity line of credit connected to Heidari's home, likely also owned by Padideh;

- that some of the Corporation's funds were transferred to and from unidentified accounts that may have been associated with Padideh;

- the irregular and unexplained transfers of the same amounts of funds to and from accounts within brief periods of time suggested possible mistakes by someone other than Heidari, who was perceived to have financial acumen;

- that the Corporation's bank statements were being sent to Heidari and Padideh's home address;

- Padideh's apparent knowledge of the Corporation's financial state and her involvement and familiarity with its finances and business operations;

- Padideh's initiation of discussions with Moradi and his wife about the sale of Moradi's half interest in the Corporation to either Heidari or a third party, and her knowledge of those circumstances;

- Padideh's sometime work without pay as a dental hygienist for Heidari's separate other dental practices and her involvement and familiarity in the operations of those businesses;

6

- her training and knowledge as a dental hygienist providing expertise about the superior x-ray equipment having been switched out from the Corporation's office in Aptos to Heidari's separate offices in San Jose or Palo Alto and replaced with inferior equipment;
- her visits to the Aptos office;
- her community-property interest in Heidari's assets that might require her to be named as a party in order to reach those assets, and the extent to which she might benefit from Heidari's misappropriation of the Corporation's assets because of her community interest in his assets.[5]

Padideh demurred to the cross-complaint in the Underlying Action, on the ground that neither the fraud nor UVTA cause of action stated facts sufficient to constitute a cause of action against her (see Code Civ. Proc., § 430.10, subd. (e)). According to the trial court's written ruling on the demurrer, issued after Kamarei and Moradi elected not to dispute the court's prior tentative ruling, the following allegations as relevant to Padideh were alleged in the cross-complaint in the Underlying Action:[6]

---

[5] In listing these factors, we do not subscribe to their truth or accuracy, instead only offering them as a summary of information or facts Kamarei testified to having relied on before naming Padideh as a cross-defendant in the Underlying Action.

[6] Moradi's cross-complaint in the Underlying Action was admitted into evidence as an exhibit at the jury trial in this case, Padideh designated various exhibits in her record designation, and exhibits are deemed a part of the record in any event under rule 8.122(a)(3) of the California Rules of Court. But it appears that the trial court by order released exhibits back to the offering parties and no exhibits were physically made a part of the clerk's transcript. That gets us to rule 8.224(a)(1) of the California Rules of Court, which provides

7

"Using corporate funds, Heidari, while acting on behalf of the Corporation, purchased four x-ray units and one Panoramic XG5 machine to be installed at the Corporation's location in Aptos. . . . After initially installing those machines at the Aptos location, Heidari then surreptitiously removed three of the x-ray units and the Panoramic XG5 machine and then installed them at Heidari's individually-owned [*sic*] dental offices in San Jose and/or Palo Alto, known as Serenity Dental Group or Serenity Dental, and then replaced them with outdated and inferior machines. . . . Heidari also billed the Corporation for the installation of the inferior machines and the removal of the new machines. . . . Further, in April 2009, Heidari engaged in a scheme with his wife, [Padideh], wrongfully diverting the Corporation's funds to their personal accounts while precluding Moradi from examining the bank statements to discover this scheme."

Specifically addressing Padideh's demurrer to the cross-complaint's fifth cause of action for fraud, the court's ruling in the Underlying Action first noted

that "[w]ithin 10 days after the last respondent's brief is filed or could be filed . . . , a party wanting the reviewing court to consider any original exhibits that were admitted in evidence, refused, or lodged but that were not copied in the clerk's transcript under rule 8.122 . . . must serve and file a notice in superior court designating such exhibits," which notice must be served on the reviewing court under rule 8.224(a)(3). Rule 8.224 of the California Rules of Court goes on to identify the process for transmittal of the designated exhibits to the reviewing court. We are not aware of any party here having complied with rule 8.224 of the California Rules of Court, and or any trial exhibits having been transmitted to this court. Hence, we do not have Moradi's amended cross-complaint in the Underlying Action, or any other exhibit, and none are being considered in our review.

Likewise, some deposition testimony from transcripts was read into the record at the jury trial without being transcribed by a court reporter, and the deposition transcripts are not included in the appellate record. We therefore lack the evidence that was placed before the jury in this manner.

8

that the allegations of the cause of action "do not even allege Padideh's name" and specifically pleaded conduct by Heidari alone. The court then observed that the general allegations of the pleading incorporated by reference in the fifth cause of action "also do not allege any facts regarding Padideh other than that her bank accounts received funds diverted from the Corporation's account by Heidari." The court concluded that the cause of action "fail[ed] to state sufficient facts to constitute a fraud claim against Padideh," sustaining her demurrer to this cause of action with 10 days leave to amend.

Specifically addressing Padideh's demurrer to the cross-complaint's sixth cause of action to set aside transfers under the UVTA, the court's ruling first noted that "it is entirely unclear as to how Moradi can be considered a creditor" under the UVTA definition (see Civ. Code, § 3439.01, subd. (c)). Moradi " 'claims that he was deprived of his right to his fair share of distributions (right to payment)' and thus he can be considered a creditor. . . . However, the sixth cause of action does not allege any such deprivation of a fair share of distributions. Moreover, the allegations do not suggest that Moradi is yet a creditor. . . . Moradi does not otherwise suggest how to amend this cause of action so as to state a claim pursuant to [UVTA]. . . ." The court then sustained Padideh's demurrer to the sixth cause of action without leave to amend.

According to Kamarei, after the filing of Moradi's cross-complaint in the Underlying Action and before the court ruled on Padideh's demurrer, he took her deposition in December 2015. She then testified that other than occasionally filling in as a hygienist, she had no involvement with her husband's dental practices or their operations or accounting functions, had no access to those businesses' bank accounts, had no ability to write checks on the business checking accounts, and had no credit cards of the businesses in her

9

name. Her deposition testimony as follows from the Underlying Action was read into evidence for the jury in this case:

"'QUESTION: When did you begin working as a dental hygienist?

"'ANSWER: 2008.

"'QUESTION: Have you worked for any other dentists . . . than the ones that you mentioned?

"'ANSWER: Yes, my husband.

"'QUESTION: And in the San Jose office, what was your job description?

"'ANSWER: I was a dental hygienist.

"'[¶] . . . [¶]

"'QUESTION: And [same] with the Palo Alto office?

"'ANSWER: Yes.

"'QUESTION: And when did you stop working as a hygienist for your husband?

"'ANSWER: End of 2013, I believe, after having my second baby.

"'QUESTION: And when you worked for your husband, were you working for him full-time?

"'ANSWER: No.

"'QUESTION: It was part-time?

"'ANSWER: Yes.

"'QUESTION: And have you ever helped him with other aspects of his business?

"'ANSWER: No.

"'QUESTION: Have you ever helped him with accounting or banking?

"'ANSWER: . . . No.

"'[¶] . . . [¶]

10

" 'QUESTION: Do you have access to any of the bank accounts of Serenity Dental?

" 'ANSWER: No.

" 'QUESTION: You don't have any signature authorization on those bank accounts?

" 'ANSWER: No.' "

Based on her deposition testimony in the Underlying Action, and that she denied having any assets separate from her husband's, who would remain as a cross-defendant in the case and whose assets could still be reached, Kamarei, as counsel for Moradi, did not dispute the trial court's tentative ruling on Padideh's demurrer. And instead of amending the fifth cause of action for fraud to shore it up with additional facts about Padideh's involvement with and connection to Heidari's dental businesses and their finances, as the court had allowed, or conducting additional relevant discovery, he filed on Moradi's behalf a third-amended cross-complaint that omitted Padideh as a party. And he did so without making any settlement demands in exchange for her clean exit from the case.

Padideh was a named party to the Underlying Action for about three months. Heidari and Moradi later settled their dispute short of trial.

II.    *Procedural Background*

Padideh filed this action for malicious prosecution against Moradi and Kamarei shortly after being dismissed from the Underlying Action, in March 2016.[7] Moradi and Kamarei asserted the unclean-hands doctrine as an affirmative defense. During discovery in this action, they obtained subpoenaed bank and other records, as well as deposition testimony, which revealed to them

---

[7] The complaint is not included in the record.

that Padideh's blanket denials at her deposition in the Underlying Action about her lack of involvement in Heidari's business and financial operations and bank accounts were not entirely true or candid.

The trial court first conducted a bench trial on the bifurcated malicious-prosecution element of the lack of probable cause for the filing of Moradi's cross-complaint in the Underlying Action—a legal issue for the court to decide. The court issued a written statement of decision on this issue in Padideh's favor. The trial court then conducted a second bifurcated bench trial on the legal issue of a termination favorable to Padideh in the Underlying Action, which was also determined in Padideh's favor. This left the other elements of malicious prosecution, including malice and any damages, to be determined by a jury. Padideh also asserted her right to a jury trial of the unclean-hands defense, to which Kamarei and Moradi ultimately stipulated.

During the jury trial, Padideh's testimony on direct examination reiterated what she had claimed in her deposition in the Underlying Action— that she never had access to Heidari's business bank accounts for any of his offices, never was an authorized signatory to his business accounts, never had access to bank records for those accounts, never made any transfers to or from his business bank accounts, and never worked in the Corporation's Aptos office. Heidari's trial testimony corroborated some of these assertions and echoed that Padideh had had no involvement in the transfer of the x-ray machines from the Aptos office to his other offices.

But, as brought out in cross-examination and in documents admitted in evidence, as well as from Kamarei's trial testimony, Padideh did have a credit card in her name from Heidari's separate dental practice and she used it to purchase office supplies for his offices. That credit card was also used to pay some other business expenses such as dental-lab bills, including for the Aptos

office, and some of these monthly amounts were as high as $22,000 and $18,000. She also sometimes used checks from a business bank account of Heidari's—into which transfers had been made from the Corporation's bank account—to pay for things like PG&E bills and the gardener and janitor for Heidari's San Jose office. It was further revealed in the course of trial testimony that Padideh was, in fact, signatory to at least one of Heidari's non-Aptos business bank accounts, and was so at the time of her 2015 deposition in the Underlying Action when she denied that. And that account was one that had received funds transferred from the Corporation's bank account. Padideh also confirmed in trial testimony that she was included on the home-equity line of credit to and from which, it was shown, some transfers had been credited from the Corporation's bank accounts. And, further, it was elicited that Heidari also used a credit card issued to him and Padideh jointly to pay some bills for the Aptos office, and then reimbursed himself. The jury also heard that in Padideh's 2018 deposition in this case, she admitted that she did in fact write checks on a business checking account of Heidari's separate practice, a fact among her asserted denials in her 2015 deposition in the Underlying Action.

At the close of the evidence, the jury was instructed on, among other things, the elements of malicious prosecution.[8] Included in this instruction was

---

[8] These elements, while not necessary to our review here and given merely for context, are: "The tort consists of three elements. The underlying action must have been: (i) initiated or maintained by, or at the direction of, the defendant, and pursued to a legal termination in favor the malicious prosecution plaintiff; (ii) initiated or maintained without probable cause; and (iii) initiated or maintained with malice." (*Parrish v. Latham & Watkins* (2017) 3 Cal.5th 767, 775–776, citing *Sheldon Appel Co. v. Albert & Oliker* (1989) 47 Cal.3d 863, 871; *Zamos v. Stroud* (2004) 32 Cal.4th 958, 970; *Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 297; CACI No. 1501.)

the element of causation—that defendants' "conduct was a substantial factor in causing" Padideh's harm. And the jury was further instructed on the meaning of "substantial factor" as the causation element of a malicious-prosecution claim. They were not instructed that this causation instruction applied to the unclean-hands defense, as Padideh now urges it does. The jury was specially instructed, without objection, on the unclean-hands defense as follows: "Defendants contend that the doctrine of unclean hands bars Plaintiff from prevailing on her claim. Not every wrongful act constitutes unclean hands. The misconduct need not be a crime or an actionable tort. Any conduct that violates conscience, or good faith, or other equitable standards of conduct is sufficient to invoke the doctrine. There must be a direct relationship between the misconduct by a plaintiff and the claimed harm by the defendants so that it would be unfair to allow the plaintiff to recover on her claim."[9]

The jury returned its special verdict form, answering "Yes" to Question 1 as applied to both Moradi and Kamarei.[10] Question 1 asked: "Did [Padideh]

---

[9] The manner in which the first prong of the unclean-hands defense—analogous case law—was decided here is not clear from the record we received on appeal. This legal issue was appropriately not put to the jury, and we therefore assume that the trial court decided it in respondents' favor at some earlier point.

[10] The jury submitted a question related to the unclean-hands defense. The trial court, after conferring with counsel and securing their agreement, answered by referring the jury back to the given special instruction. The question and answer themselves are not part of the record. But they are described in Padideh's motion for new trial. The question was described as: " 'Please describe Question No. 1 in layman's terms. Could you provide an obvious example where this defense would be successful.' " The court's answer was described as: " 'Question No. 1 asks whether or not plaintiff acted with unclean hands as defined in [the jury instruction]. That is, whether there was a wrongful act or misconduct on the part of the plaintiff as defined in [the jury instruction] and, if so, whether there was a direct relationship between the

14

have unclean hands?" The verdict form then instructed the jury that if they answered yes to Question 1, they should stop there, answer no further questions, and have the presiding juror sign and date the form. The jury was polled and their vote was revealed to be nine jurors answering "Yes" to Question 1 and three jurors answering "No"—a defense verdict. Judgment on the verdict was then entered in favor of Kamarei and Moradi and against Padideh.

Padideh unsuccessfully moved for a new trial on the grounds of insufficiency of the evidence to justify the verdict or that the verdict is against law (Code Civ. Proc., § 657, subd. (6)), and for JNOV, solely focusing in both on the unclean-hands defense. She then timely appealed from the judgment.[11]

---

misconduct or wrongful act by plaintiff and the claimed harm by the defendants so that it would be unfair to allow the plaintiff to recover on her claim. The Court cannot give an example of unclean hands as requested because the jury has to make its decision based on the facts of this case. Please refer to [the jury instruction]." Padideh raises no issue on appeal with the court's answer.

[11] The denial of a motion for new trial is not directly appealable but is reviewable on appeal from the judgment. (*Walker v. Los Angeles County Metro Transportation Authority* (2005) 35 Cal.4th 15, 18.) The denial of a motion JNOV is directly appealable. (Code Civ. Proc., § 904.1, subd. (a)(4); *Sweatman v. Dept. of Veterans Affairs* (2001) 25 Cal.4th 62, 68.) Padideh's notice of appeal does not indicate that she is directly appealing from this post-trial order. The proper scope of the appeal is therefore limited to her appeal from the judgment. Even so, we review the denial of JNOV to determine whether substantial evidence supports the jury verdict; if so, the denial will be upheld. (*Licudine v. Cedars-Sinai Med. Center* (2016) 3 Cal.App.5th 500, 514.) Thus, to the extent the appeal from the judgment here raises the same substantial-evidence questions, our standard of review is the same and we are in effect also reviewing the JNOV denial.

## DISCUSSION

I.   *Issue on Appeal and Standard of Review*

Padideh challenges the sufficiency of the evidence of the unclean-hands defense to bar her malicious-prosecution claim against Kamarei and Moradi. She contends that "as a matter of law," the evidence was insufficient to prove the elements of the defense.

As noted, courts now apply a "three-pronged test to determine the effect to be given to the plaintiff's unclean hands conduct. Whether the particular misconduct at issue is a bar to the alleged claim for relief depends on (1) analogous case law, (2) the nature of the misconduct, and (3) the relationship of the misconduct to the claimed injuries. [Citations.]" (*Kendall-Jackson, supra,* 76 Cal.App.4th at p. 979, citing *Blain v. Doctor's Co.* (1990) 222 Cal.App.3d 1048, 1060 (*Blain*); accord *Unilogic, Inc. v. Burroughs Corp.* (1992) 10 Cal.App.4th 612, 618–621 (*Unilogic*), see *id.* at p. 620 [referring to test as "the *Blain* test"]; *CrossTalk Productions, Inc. v. Jacobson* (1998) 65 Cal.App.4th 631, 641–643 (*CrossTalk*).)

*Kendall-Jackson* itself involved the application of the defense by the trial court in a malicious-prosecution action in the context of a summary judgment motion. Like many of the cases addressing the unclean-hands doctrine, *Kendall-Jackson* observed that "[w]hether the doctrine of unclean hands applies is a question of fact." (*Kendall-Jackson, supra*, 76 Cal.App.4th at p. 978; see also *CrossTalk, supra*, 65 Cal.App.4th at p. 639 [finding factual ambiguity on face of complaint and reversing judgment of dismissal after sustention of demurrer based on unclean-hands defense]; *Insurance Co. of North America v. Liberty Mutual Ins. Co.* (1982) 128 Cal.App.3d 297, 306–307 (*Insurance Co.*); *Fibreboard Paper Products Corp. v. East Bay Union of Machinists* (1964) 227 Cal.App.2d 675, 726–727 (*Fibreboard*) [reversing judgment of dismissal after

16

demurrer]; *Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton LLP* (2005) 133 Cal.App.4th 658, 681 (*Peregrine*) [unclean-hands defense generally presents question of fact but may be raised at pleading stage or on motion to strike if plaintiff's own pleadings establish the basis of the defense].)

Other cases have identified the question whether the unclean-hands doctrine can be applied to a particular transaction as a legal issue reviewed de novo. (See e.g., *Brown v. Grimes* (2011) 192 Cal.App.4th 265, 275 (*Brown*) [concluding doctrine inapplicable on de novo review based on application of three-pronged *Blain* test and declining to decide standard of review "of an unclean hands determination if the doctrine" were applicable], citing *Jay Bharat Developers, Inc. v. Minidis* (2008) 167 Cal.App.4th 437, 445–446 (*Jay Bharat*) [applying three-pronged *Blain* test on appeal from preliminary injunction order in fraudulent-inducement case].) Although *Brown* and the parties here cite *Jay Bharat* for the proposition that whether the unclean-hands defense can be applied to a particular transaction is a legal issue reviewed de novo, *Jay Bharat* nowhere expressly so holds. But we read *Brown* to perceive *Jay Bharat* as having functionally applied de novo review in its application of the *Blain* test, the latter two prongs of which were here submitted to the jury for a factual determination, unlike in *Jay Bharat* or *Brown*.

In its statement that it was unnecessary in that case "to decide the standard of review of an unclean hands determination if the doctrine" were first found to be applicable to the circumstances as a matter of law—because the court found it inapplicable in that case at this preliminary threshold—the *Brown* court went on to collect cases reviewing unclean-hands determinations for abuse of discretion on the one hand and for substantial evidence on the other. (*Brown, supra*, 192 Cal.App.4th at p. 275 ["Compare *Dickson, Carlson & Campillo v. Pole* (2000) 83 Cal.App.4th 436, 447 [abuse of discretion] and *Lovett*

17

*v. Carrasco* (1998) 63 Cal.App.4th 48, 55 [abuse of discretion] with *California School Employees Assn., Tustin Chapter No. 450 v. Tustin Unified School Dist.* (2007) 148 Cal.App.4th 510, 521 [substantial evidence], *In re Marriage of Dancy* (2000) 82 Cal.App.4th 1142, 1157 [substantial evidence], superseded by statute on other grounds as stated in *In re Marriage of Fellows* (2006) 39 Cal.4th 179, 185, fn. 6, *Kendall-Jackson*[, *supra*, 76 Cal.App.4th at p.] 978 ['Whether the doctrine of unclean hands applies is a question of fact.'], *Unilogic,* [*supra*, 10 Cal.App.4th at p.] 620 [question of fact] and *Insurance Co.*[, *supra*, 128 Cal.App.3d at p.] 306 ['As a general rule, the application of the doctrine of unclean hands is primarily a question of fact.' "]; see also *Aguayo v. Amaro* (2013) 213 Cal.App.4th 1102, 1109 (*Aguayo*) [review of trial court's decision to apply unclean-hands defense for abuse of discretion but its factual findings in the exercise of that discretion reviewed for substantial evidence].)

We note that the unclean-hands doctrine is available as a defense in both equitable actions decided by a court and legal actions more often decided by a jury. (*Unilogic, supra*, 10 Cal.App.4th at pp. 618–623.) And as shown by our citations above, it has been applied in various procedural contexts from demurrers and motions to strike to injunctions, all of which present issues decided by the court, and to, as here, a jury trial in which the jury decides as an evidentiary matter whether the plaintiff's unclean hands will bar their claim. The variance in the standard of review applied on appeal in cases involving the unclean-hands defense is likely attributed to the corresponding variance in the type of case and procedural context involved.

It seems to us that in applying the three-pronged *Blain* test, the task of addressing the first prong—analogous case law—presents a legal issue to which we would apply independent review. Indeed, the jury here was not instructed on this issue and did not decide the question. But as for the second and third

18

prongs—the nature of the misconduct and the relationship of the misconduct to the claimed injuries, respectively—when a jury decides the facts and the applicability of the defense based on their factual resolutions, and the ensuing appeal raises the sufficiency of the evidence to support the jury's verdict, we would apply substantial-evidence review on appeal, as distinct from the abuse-of-discretion standard. (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1006 (*O.B.*) [appellate court addressing a claim of insufficient proof reviews the record for substantial evidence to support the challenged finding].) We may in other circumstances—in which a trial court has exercised discretion in equitable or other contexts—review the application of the unclean-hands defense for abuse of discretion, and even then, we would apply substantial-evidence review to the court's resolution of factual questions. (*Aguayo, supra*, 213 Cal.App.4th at p. 1109.) But we are not presented with that circumstance here. The trial court did not exercise discretion in applying the unclean-hands defense, instead submitting the question to the jury as Padideh had requested. We thus do not reach that question.

Accordingly, we will review the first prong of the *Blain* test—the question of analogous case law—independently. We will review Padideh's claim of insufficiency of the evidence to support the jury's determination of the second and third prongs—the nature of the misconduct and the relationship of that misconduct to the claimed harm—for substantial evidence.

"Substantial evidence is evidence that is 'of ponderable legal significance,' 'reasonable in nature, credible, and of solid value,' and ' "substantial" proof of the essentials which the law requires in a particular case.' [Citation.]" (*O.B., supra*, 9 Cal.5th at p. 1006.) In applying substantial-evidence review, we review the whole record (or at least the whole of the record as provided by appellant). (*People v. Johnson* (1980) 26 Cal.3d 557, 577 [court must review entire record

on appeal in measuring the sufficiency of the evidence].) And, in doing so, we view the record in the light most favorable to respondent, resolving all evidentiary conflicts and indulging all reasonable inferences to support the judgment. (*Leung v. Verdugo Hills Hosp.* (2012) 55 Cal.4th 91, 308.) The trial court's resolution of disputed factual issues must be affirmed so long as supported by substantial evidence. (*Winograd v. American Broadcasting Co.* (1998) 68 Cal.App.4th 624, 632.) Reversal for insufficient evidence is rare, as a party raising a claim of insufficiency of the evidence assumes a " 'daunting burden.' " (*Whitely v. Philip Morris Inc.* (2004) 117 Cal.App.4th 635, 678.)

In sum, "[w]hen, as here,] an appellant argues that a particular verdict is not supported by sufficient evidence, our review '*begins* and *ends* with the determination as to whether, on the entire record, there is substantial evidence, contradicted or uncontradicted, which will support the determination.' [Citation.]" (*DeNike v. Mathew Enterprise, Inc.* (2022) 76 Cal.App.5th 371, 381 (*DeNike*).)

II.   *The Jury's Verdict Applying the Unclean-Hands Defense to Bar Padideh's Malicious-Prosecution Claim Was Adequately Supported*

A. <u>The Unclean-Hands Defense</u>

We have already provided by way of introduction some discussion of the unclean-hands defense. As noted, it generally consists of three elements, sometimes aptly called the "the *Blain* test," referring to the case that first articulated these elements as a synthesized three-pronged test derived from an overview of "the disparate law of unclean hands." (*Blain, supra*, 222 Cal.App.3d at p. 1058, initial caps omitted; see *id.* at p. 1060.) After providing that general overview, the *Blain* court "glean[ed] from this sparse product that whether there is a bar [to a plaintiff's recovery] depends upon the analogous case law, the nature of the misconduct, and the relationship of the misconduct to the

20

claimed injuries." (*Id.* at p. 1060.) Courts continue to apply this test, making refinements and distinctions along the way. (See, e.g., *Unilogic, supra,* 10 Cal.App.4th at pp. 618–623 [extensive discussion of *Blain* test]; *Kendall-Jackson, supra,* 76 Cal.App.4th at pp. 978–988 [same].)

We address in turn each of the three prongs of the *Blain* test as applied to this malicious-prosecution case.

### B. Analogous Case Law

Given that Kamarei and Moradi prevailed on their unclean-hands defense, and that the question of analogous case law was appropriately not put to the jury, the trial court must have determined this legal issue—the first prong of the *Blain* test—adversely to Padideh.

*Blain* did not define what is meant by "analogous case law" or provide a precise explanation for how this prong of the test is analyzed or satisfied. (*Blain, supra,* 222 Cal.App.3d at pp. 1059–1060.) But it discussed the general legal circumstances and fact pattern of the case before it and roughly compared it to prior cases presenting such similarities or parallels. (*Ibid.*)

*Blain* arose in the context of a claim for legal malpractice. The court described the specific question presented there as "whether the doctrine of unclean hands precludes an action for legal malpractice predicated upon injuries caused when Raymond L. Blain, a physician-defendant in a [prior] medical malpractice action, followed the advice of his lawyer to lie at a deposition." (*Blain, supra,* 222 Cal.App.3d at p. 1052.) The malpractice complaint was "founded upon the claim that insurance defense counsel advised Blain, the insured, to lie at his deposition in the medical malpractice action, which advice Blain followed. This resulted in the filing of an amended complaint against Blain seeking punitive damages. . . . Blain contends that in these circumstances, he has stated a [legal-malpractice] cause of action on the

21

theory that defense counsel's improper strategy exposed him to greater liability, caused him emotional distress, and precluded his further work as a physician." (*Ibid.*)

The court first generally discussed the doctrine of unclean hands, observing that it was composed of not one "but a number of disparate doctrines, dependent for their substance upon the *context of application.*" (*Blain, supra,* 222 Cal.App.3d at p. 1059, italics added.) After noting that the doctrine applied in both equitable and legal actions, and quoting from a law review article (Chafee, *Coming Into Equity With Clean Hands* (1949) 47 Mich. L.Rev. 877), the court described the common theme among the cases as the presence of the " 'plaintiff's fault.' " (*Blain, supra,* 222 Cal.App.3d at p. 1059.) The court noted that this principle " 'has rather weak unifying qualities. It can better be described as a string around a loose bundle of separate defenses which somewhat resemble each other. The resemblance may occasionally render analogies helpful, but more significant is the way the effect given to the plaintiff's misconduct depends on the nature of his wrong and on the nature of the defendant's wrong. In other words, this vague single principle gets most of its qualities in a given group of cases from the substantive law of the particular subject' "—meaning like-kind cases. (*Ibid.*)

The court then said, "[f]ollowing this analysis" (as provided by the referenced law review article), "we must identify the category within the aggregate of 'clean hands' cases to which [the *Blain*] case belong[ed]." (*Blain, supra,* 222 Cal.App.3d at p. 1059.) The court then discussed two other legal malpractice cases described as "involving injuries resulting from client perjury engaged in at the behest of counsel" in prior criminal cases (*id.* at p. 1060), *Blain* being a civil case, and two other cases involving clients who had colluded with their attorneys to fraudulently transfer property to remove it from the

22

reach of creditors, and then sought the aid of the court to get their property back. (*Id.* at pp. 1061–1062.) The common theme being the client engaging in misconduct at the behest or with the collusion of the attorney and then seeking redress and the aid of the court for the consequences.

The *Blain* court did not find any of these four cases to be controlling precedent in the case before it. But as the *Unilogic* court put it in describing *Blain*'s discussion of analogous case law and focusing on the two prior legal malpractice cases it had identified, "Although not precisely on point, these [malpractice] precedents guided the court to a conclusion that the affirmative defense was available in *Blain* as well." (*Unilogic, supra*, 10 Cal.App.4th at p. 619.) From *Blain*, we can glean that the first prong of the unclean-hands defense does not require "analogous case law" to be controlling or on all fours to the case at hand to find the defense applicable. Rather, "analogous case law" means similar case types to set and frame the context for determining whether the unclean-hands defense is available at all in that general circumstance.

In that vein, in *Kendall-Jackson*, a malicious prosecution case, the court addressed this first prong of the unclean-hands doctrine by discussing two prior malicious prosecution cases that had applied the doctrine as a bar to recovery—*Pond v. Insurance Co. of North America* (1984) 151 Cal.App.3d 280, 284–285, 291 (*Pond*), and *DeRosa v. Transamerica Title Ins. Co.* (1989) 213 Cal.App.3d 1390, 1393–1395 (*DeRosa*). (*Kendall-Jackson, supra*, 76 Cal.App.4th at pp. 979–981.) The "analogousness" of these two cases for this prong was enough just because they were both malicious-prosecution actions, like *Kendall-Jackson* itself, and even though the facts and underlying actions in each were different.

In *Pond*, as described by *Kendall-Jackson* in its discission of analogous case law, Pond sold insurance policies and, it was later learned, lied in a wrongful-death action about his understanding of certain insurance coverages

23

at play, creating ambiguity about available coverage. As a result of that ambiguity, one insurer settled the wrongful-death suit and then sued Pond for indemnity—the underlying action. (*Kendall-Jackson, supra*, 76 Cal.App.4th at p. 980; *Pond, supra*, 151 Cal.App.3d at pp. 285–286.) Pond prevailed in the indemnity action, the trial court finding "that [he] had done nothing to mislead" concerning the coverages. (*Kendall-Jackson, supra*, 76 Cal.App.4th at p. 980; *Pond, supra*, 151 Cal.App.3d at pp. 285–286.)

Pond then sued the insurer for malicious prosecution. During that case, discovery revealed that Pond had lied in the earlier wrongful-death action and had also not disclosed certain relevant information in the indemnity case. (*Kendall-Jackson, supra*, 76 Cal.App.4th at p. 980; *Pond, supra*, 151 Cal.App.3d at pp. 286, 290.) According to the *Pond* court, the undisclosed information "if timely disclosed, may well have changed the outcome of the [underlying] indemnity action." (*Pond, supra*, 151 Cal.App.3d at p. 291.) The *Pond* court affirmed summary judgment in favor of the insurer, applying the unclean-hands defense to bar Pond's recovery for malicious prosecution. (*Kendall-Jackson, supra*, 76 Cal.App.4th at p. 980; *Pond, supra*, 151 Cal.App.3d at pp. 284, 291.)

In *DeRosa*, also discussed in *Kendall-Jackson* as analogous case law, conduct by DeRosa concerning an escrow related to the sale of his property led to a quiet-title action brought by Transamerica Title Insurance Company. DeRosa became "uncooperative," which resulted in Transamerica adding a fraud claim against him in the action. DeRosa prevailed on the fraud claim and sued for malicious prosecution. (*Kendall-Jackson, supra*, 76 Cal.App.4th at p. 981; *DeRosa, supra*, 213 Cal.App.3d at pp. 1393–1395.) Transamerica raised the unclean-hands defense and moved for summary judgment. In opposing that motion, DeRosa submitted a declaration in which he denied any intention to

24

defraud Transamerica but "acknowledged unconscientious conduct in the [escrow] transaction" in that he had previously sold his property to another party but had agreed to hold title to keep the property beyond his buyer's creditors' reach while still receiving payments from the buyer for the sale. (*Kendall-Jackson*, *supra*, 76 Cal.App.4th at p. 981.) DeRosa later "tired of the arrangement" and sought to extricate himself, which resulted in the buyer conveying the property to a third party out from under DeRosa. (*Ibid.*) It was this that led to DeRosa instructing Transamerica to initiate an action to quiet title to the property in him, without telling Transamerica about his prior arrangement with the buyer to thwart the buyer's creditors. (*Ibid.*; *DeRosa, supra*, 213 Cal.App.3d at pp. 1395–1396.)

As discussed in *Kendall-Jackson*, the *DeRosa* court "rejected DeRosa's argument that the malicious prosecution action was unrelated to his conduct in assisting [his buyer] to defraud his creditors and, therefore, the unclean hands doctrine should not apply. The malicious prosecution action arose from the quiet title action that Transamerica prosecuted on DeRosa's behalf. It was only because DeRosa concealed the true facts underlying the conveyance [of the property] that Transamerica became involved and, subsequently, proceeded against DeRosa for fraud. The malicious prosecution action was directly related to DeRosa's unconscionable conduct in the underlying action. (*DeRosa, supra*, 213 Cal.App.3d at p. 1397.)" (*Kendall-Jackson, supra*, 76 Cal.App.4th at p. 981.)

The result of *Kendall-Jackson*'s discussion of this analogous case law—two other malicious-prosecution cases in which the unclean-hands doctrine was applied to bar the plaintiffs' claims—was its general conclusion that "[u]nder the analogous case law prong of the *Blain* test, a plaintiff's unclean hands conduct in the underlying action or in the transaction that was the subject of that action can preclude relief in a subsequent malicious prosecution suit."

(*Kendall-Jackson, supra*, 76 Cal.App.4th at p. 981.) The factual details and timing of the preceding misconduct barring recovery to the plaintiff in the later malicious-prosecution cases were naturally different. But this prong was nonetheless satisfied in *Kendall-Jackson* because analogous case law—other malicious-prosecution actions generally—had shown the unclean-hands doctrine to be available and particularly appropriate to apply in that case type.

*Kendall-Jackson* itself granted a writ petition directing the trial court to vacate an order granting summary adjudication of Kendall-Jackson's unclean-hands defense against it. The court observed that the "fundamental interest protected by the malicious prosecution tort is freedom from unjustifiable and unreasonable litigation. [Citations.] But, malicious prosecution is a disfavored action. Constitutional principles, as well as strong public policy, favor open access to the courts for the resolution of conflicts and the redress of grievances. [Citation.] This strong public policy coupled with the equitable principles underlying the doctrine of unclean hands—to protect the integrity of the court and ensure a just result—bodes in favor of a broad application of the doctrine in malicious prosecution actions." (*Kendall-Jackson, supra*, 76 Cal.App.4th at p. 986.)

Other cases not involving malicious-prosecution actions have much more generally addressed the analogous-case-law prong of the *Blain* test for application of the unclean-hands defense, and have found this prong satisfied with the mere existence of prior cases of similar type having applied the defense. For example, in *Jay Bharat*, the court's discussion of this prong of the *Blaine* test was limited to this: "As for analogous case law, courts have concluded that injunctive relief is appropriate where a terminated franchisee continues to use a franchisor's trademark. [Citations.]" (*Jay Bharat, supra*, 167 Cal.App.4th at p. 446.) Similarly, but presenting the converse, in rejecting the

26

application of the unclean-hands doctrine, the court in *CrossTalk* said only: "Defendant has cited no authority finding unclean hands generally to be a defense to claims for extortion or 'economic duress' in other factual circumstances, or generally to be a defense to claims for intentional or negligent infliction of emotional distress." (*CrossTalk, supra*, 65 Cal.App.4th at p. 642.)

Padideh here urges that the analogous-case-law prong of the *Blain* test is not met. She does so by conflating the second and third prongs of the test into her analysis of the first prong in an attempt to factually distinguish *Kendall-Jackson*, *Pond*, and *DeRosa* as controlling precedent. And by pointing to cases of other types that are not in the intended sense "analogous." (See, e.g., *Jade Fashion & Co., Inc. v. Harkham Industries, Inc.* (2014) 229 Cal.App.4th 635, 641 [breach of contract, goods sold and delivered, open book account, account stated, and breach of guaranty]; *Murillo v. Rite Stuff Foods Co.* (1998) 65 Cal.App.4th 833, 838–839 [sexual harassment, wrongful termination, breach of contract, and breach of covenant of good faith and fair dealing]; *Germo Mfg. Co. v. McClellan* (1930) 107 Cal.App. 532, 535 (*Germo*) [trade-secret misappropriation]; *Fibreboard, supra*, 227 Cal.App.2d at pp. 685–686 [injunction in context of tortious conduct in establishment of picket line]; *Vacco Industries, Inc. v. Van Den Berg* (1992) 5 Cal.App.4th 34, 40 [trade-secret misappropriation]; *Jamarillo v. County of Orange* (2011) 200 Cal.App.4th 811, 814 [backpay].)

But, as is clear from *Blain* and *Kendall-Jackson,* the point of the first prong of the *Blain* test is not to distinguish among all types of cases in which unclean hands was asserted or applied as a defense. Nor is it to determine controlling precedent among cases of like kind. It is rather to preliminarily ascertain the "context of application" (*Blain, supra,* 222 Cal.App.3d at p. 1059) by identifying the general category of case type or legal circumstances

27

presented and asking whether the doctrine of unclean hands has been recognized as applicable in that context or setting. This is a distinct task from factually parsing either among all case types or even acknowledged like-kind cases to distinguish the type or degree of misconduct or the directness of the relationship between the conduct and the claimed harm—the more factually focused second and third prongs of the *Blain* test.

Applying our independent review to the issue, and echoing *Kendall-Jackson*'s observation of the suitability of malicious-prosecution actions for application of the unclean-hands doctrine (*Kendall-Jackson, supra*, 76 Cal.App.4th at p. 986), we conclude that *Kendall-Jackson*, *Pond*, and *DeRosa*—all malicious-prosecution actions addressing and applying the doctrine of unclean hands—are analogous case law for purposes of satisfying the first prong of the *Blain* test here. They represent a category of case type to which this case belongs, and they show that applying the unclean-hands doctrine in a malicious-prosecution action, under the proper factual circumstances as measured by the other prongs of the *Blain* test, is well-tread ground. That's all that is required at prong one, a threshold easily met here.

### C. The Nature of the Misconduct

"The second prong of the *Blain* test examines the nature of the misconduct. (*Blain, supra*, 222 Cal.App.3d at p. 1060.)" (*Kendall-Jackson, supra*, 76 Cal.App.4th at p. 982.) As accurately described in the special jury instruction here, "[n]ot every wrongful act constitutes unclean hands. The misconduct need not be a crime or an actionable tort. Any conduct that violates good conscience, or good faith, or other equitable standards of conduct is sufficient to invoke the doctrine." (See *id.* at p. 979; *Meridian Financial Services, Inc. v. Phan* (2021) 67 Cal.App.5th 657, 685 (*Meridian*); *DeGarmo v. Goldman* (1942) 19 Cal.2d 755, 764 ["Any unconscientious conduct upon his

28

part which is connected with the controversy will repel him from the forum whose very foundation is good conscience. [Citation.]"].)

Kamarei and Moradi offered to the jury here Padideh's less-than-candid deposition testimony in the Underlying Action as her misconduct sufficient to invoke their unclean-hands defense. As noted, because the jury here made a factual determination on Padideh's conduct based on the evidence presented, we will review that determination for substantial evidence.

Based on our review of the record, there was substantial evidence that Padideh had not been candid in her prior deposition, or had even lied, even if only by misleading omissions. She gave uncategorical and absolute denials of any involvement or role in her husband Heidari's dental businesses, other than occasionally filling in as a hygienist at the San Jose or Palo Alto offices for no pay. She denied assisting him in any other way in those operations, including in their financial or accounting aspects. She denied having any access to the business bank accounts or to its credit. This testimony was misleading at best and false at worst. The evidence showed that, in fact, Padideh had assisted in minor financial or operational aspects of Heidari's businesses by paying creditors for expenses, by regularly using a business credit card issued in her name, by being signatory to at least one business bank account and writing checks on that account, and by allowing their home equity line of credit of which she was a co-owner to be used in transfers of funds to and from the Corporation's accounts. This evidence of Padideh's lack of candor or falsity in her deposition is substantial evidence to support the jury's verdict on the second prong of the *Blain* test addressing the nature of her misconduct.

To be sure, Padideh's demonstrated involvement in her husband's businesses was not shown by the record facts to amount to any misdeed or misconduct. Her conduct in this regard was not criminal or tortious or even

29

unethical. It was not extensive or executive or managerial in nature, and for the most part could be described as passive. But her misconduct supporting the unclean-hands defense was not that involvement itself. It was, rather, her lack of candor in her deposition testimony in the Underlying Action that painted a factually inaccurate and misleading picture of her actual role. Kamarei and Moradi relied on that distorted picture in making the strategic litigation decisions to not contest the court's tentative ruling sustaining Padideh's demurrer to Moradi's cross-complaint; to not attempt any allowable amendments to the fifth cause of action for fraud; and to allow her unconditional exit from the case without pursuing further discovery concerning the extent of her involvement in Heidari's business operations and without making any settlement demand.

Padideh contends that there is an insufficiency of evidence as to the nature of her misconduct to support application of the unclean-hands defense. But her efforts to minimize her lack of candor or falsity in her deposition, or to dispute its materiality, as determined by the jury, are unavailing under substantial-evidence review. And she again conflates factors going to a different prong of the *Blain* test—the third one addressing the relationship of the misconduct to the claimed harm—with the second as though an urged lack of direct connection on the third prong affects or negates the nature of the misconduct itself.

But these are analytically separate matters. Contrary to Padideh's arguments, Kamarei and Moradi did not need to prove for the second prong of the *Blain* test that Padideh had in fact committed fraud in her role in Heidari's businesses, or that the true state of facts, if alleged by amendment, would have certainly kept her in as a cross-defendant in the Underlying Action. In terms of the nature of the misconduct, all that is required is that it "violate[d]

30

conscience, or good faith, or other equitable standards of conduct." (*Kendall-Jackson, supra*, 76 Cal.App.4th at p. 979; see also *DeRosa, supra*, 213 Cal.App.3d at pp. 1395–1396.) Falsity or lack of candor displayed in a deposition or other concealment of relevant information in an underlying action can meet the test for the nature or kind of misconduct that will support the unclean-hands defense to an action, malicious prosecution or otherwise. (*Blain, supra*, 222 Cal.App.3d at p. 1052–1053 [ill-advised perjury in deposition testimony]; *Id.* at p. 1063 ["[e]ven the most naïve must know that lying under oath is illegal"]; *Pond, supra*, 151 Cal.App.3d at p. 291 [failure to disclose critical documents in discovery in prior action without a finding of perjury, concealment, or other illegal conduct]; *Kendall-Jackson, supra*, 76 Cal.App.4th at pp. 982–983 [less than illegal or tortious marketing misconduct spurring the underlying action].)

Our substantial-evidence review begins and ends with our ascertaining that there is sufficient evidence in the record, contested or uncontested, to support the jury's verdict and its implied finding that the nature of Padideh's misconduct supported application of the unclean-hands defense here. (See *DeNike, supra,* 76 Cal.App.5th at p. 381.) Our review of the record on this issue confirms that the jury's verdict is sufficiently supported, and we reject Padideh's arguments to the contrary.

### D. The Relationship Between the Misconduct and the Claimed Harm

The third prong of the *Blain* test, which we also review here for substantial evidence, assesses the relationship between the misconduct and the claimed harm. The jury here was properly instructed that "[t]here must be a direct relationship between the misconduct by a plaintiff and the claimed harm

31

by the defendants so that it would be unfair to allow the plaintiff to recover on her claim."

Kamarei and Moradi offered evidence that Padideh's lack of candor or lying at her deposition in the Underlying Action about her lack of involvement in Heidari's businesses harmed them by adversely affecting their litigation decisions in that action, which precipitated this later malicious-prosecution case. Because of her prior deposition testimony, they did not contest the court's tentative ruling sustaining her demurrer to Moradi's cross-complaint; did not then conduct further discovery to ascertain the extent of her business, financial, or operational involvement with Heidari's businesses with certainty; did not file an amended cross-complaint adding facts pertaining to Padideh when the court had allowed leave to amend Moradi's fraud claim; and did not make any settlement demand (which, in theory, may well have been for only a nominal amount of money or even no money, but which likely would have included a more valuable general release that would have precluded this malicious-prosecution action), instead allowing Padideh to cleanly and unconditionally exit from the case. This evidence gives rise to reasonable inferences that Kamarei and Moradi would have made different litigation decisions had they known the true facts, and that the Underlying Action "may well have" resolved differently, even by settlement. (*Pond, supra*, 151 Cal.App.3d at p. 291 [misconduct "may well have changed the outcome of the [underlying] indemnity action"].)

As observed by the *Kendall-Jackson* court, "[t]he misconduct that brings the unclean hands doctrine into play must relate directly to the transaction concerning which the complaint is made. It must infect the cause of action involved and affect the equitable relations between the litigants. (*Pond, supra*, 151 Cal.App.3d at p. 290.)" (*Kendall-Jackson, supra*, 76 Cal.App.4th at p. 984.)

32

But *Kendall-Jackson* also held that in a malicious-prosecution action, the plaintiff's misconduct need not directly relate to the defendant's decision to file or pursue the prior underlying action in order to apply the unclean-hands doctrine. (*Kendall-Jackson, supra,* 76 Cal.App.4th at p. 985 [rejecting such a "narrow rule"].)

The *Kendall-Jackson* court noted that in *Pond* and *DeRosa*, the claimed misconduct had affected the defendants' decisions to file or pursue the prior litigation. But "neither court tied its application of the unclean hands doctrine to that fact. Rather, the courts looked at the larger picture and concluded that the plaintiff's misconduct had infected the malicious prosecution cause of action, or had related directly to the transaction concerning which the complaint was made—the underlying lawsuit. [Citations.] Simply stated, permitting Pond or DeRosa to recover damages for [the plaintiff having to] defend[] the unsuccessful underlying actions was unjust because their misconduct had precipitated those actions and thus affected the equitable relations between the litigants in the malicious prosecution action. Neither *Pond* nor *DeRosa* supports [that] narrow application of the doctrine." (*Kendall-Jackson, supra*, 76 Cal.App.4th at p. 985.) It was thus not necessary in *Pond* and *DeRosa* for the misconduct at issue in those cases to have, in fact, precipitated the prior underlying actions; but because it did, the misconduct *affected the equitable relations between the parties*—key to assessing the degree of directness required to sustain the unclean-hands defense.

The *Kendall-Jackson* court went on to emphasize, as we've noted, that the unclean-hands defense "is not a legal or technical defense to be used as a shield against a particular element of a cause of action. Rather, it is an equitable rationale for refusing a plaintiff relief where principles of fairness dictate that the plaintiff should not recover, regardless of the merits of [their] claim. It is

33

available to protect the court from having its powers used to bring about an inequitable result in the litigation before it. [Citation.] Thus, *any* evidence of a plaintiff's unclean hands in relation to the transaction before the court or which affects the equitable relations between the litigants in the matter before the court should be available to enable the court to effect a fair result in the litigation." (*Kendall-Jackson, supra*, 76 Cal.App.4th at p. 985, italics added.) The unclean-hands defense "goes beyond the justification for filing the malicious prosecution suit; unclean hands concerns the far broader question of a party's misconduct in the matter. [Citation.]" (*Id.* at p. 986.)

The purpose of the directness requirement of the third prong of the *Blain* test is to rule out application of the unclean-hands defense when the plaintiff is "merely guilty of unrelated improper past conduct." (*Pond, supra*, 151 Cal.App.3d at p. 290.) " 'Broad as the [unclean-hands] principle is in its operation, it must still be taken with reasonable limitations; it does not apply to every unconscientious act or inequitable conduct on the part of a plaintiff. The maxim, considered as a general rule controlling the administration of equitable relief in particular controversies, is confined to misconduct in regard to, or at all events connected with, the matter in litigation, so that it has in some measure affected the equitable relations subsisting between the two parties, and arising out of the transaction; it does not extend to any misconduct, however gross, which is unconnected with the matter in litigation, and with which the opposite party has no concern.' " (*Germo, supra*, 107 Cal.App. at pp. 541–542.)

Clean hands thus "has reference to the particular transaction, in which relief is sought, and not to the general morals or conduct of the person seeking relief," meaning the defense may not be interposed by showing acts of plaintiff's misconduct that are entirely unconnected with the matter being litigated. (*Germo, supra,* 107 Cal.App. at p. 543.) Likewise, "[t]he determination of

34

whether the unclean hands defense applies 'cannot be distorted into a proceeding to try the general morals of the parties.' (*Kendall-Jackson, supra*, 76 Cal.App.4th at p. 979.) 'The issue is not that the plaintiff's hands are dirty, but rather " ' "that the manner of dirtying renders inequitable the assertion of such rights against the defendant." ' " ' [Citation.]" (*Meridian, supra*, 67 Cal.App.5th at pp. 685–686.) " 'A person is not placed forever entirely outside the protection of the law in a particular transaction, because, forsooth, sometime in the distant past he was guilty of an improper act. [Citation.] But the [unclean-hands] doctrine does apply 'if the inequitable conduct occurred in a transaction directly related to the matter before the court and affects the equitable relationship between the litigants. [Citations.]' [Citation.]" (*Unilogic, supra*, 10 Cal.App.4th at p. 621; see also *Peregrine, supra*, 133 Cal.App.4th at pp. 680–681 [to relate directly in this context means only that the misconduct must pertain to the very subject matter involved and affect the equitable relations between the litigants; it need not be part of the basis upon which liability is being asserted].)

Padideh argues here that the directness requirement of the relationship between the misconduct and the claimed harm, embodied in the third prong of the *Blain* test, entails a showing in a malicious-prosecution action that the misconduct was a substantial factor in causing the claimed harm. She further urges the requirement of a separate showing of prejudice—that absent the misconduct, the malicious-prosecution defendant would have prevailed in the underlying action. She claims there is insufficient evidence of these showings here, which compels reversal of the judgment. Although these elements may be present in some cases, the unclean-hands doctrine does not require their proof, either as part of the third prong of the *Blain* test or in addition to it. These suggested additional requirements to invoke the unclean-hands doctrine conflict with the notion that the doctrine "is not a legal or technical defense to be used

35

as a shield against a particular element of a cause of action" and that its availability benefits the court and protects it "from having its powers used to bring about an inequitable result in the litigation before it. [Citations.]" (*Kendall-Jackson, supra*, 76 Cal.App.4th at p. 985.) As a different panel of this court did in *Unilogic*, we reject this "unreasonably narrow view of the unclean hands doctrine" that Padideh urges. (*Unilogic, supra*, 10 Cal.App.4th at p. 621.)

There was substantial evidence presented to the jury here that Padideh showed a lack of candor or even lied in her deposition in the Underlying Action, and that this had a direct effect on Kamarei and Moradi's litigation decisions in that action, which was the precipitating action for this malicious-prosecution suit. In the "larger picture," the misconduct infected the malicious-prosecution cause of action or related directly to the subject matter before the court in this case, which subject matter included the Underlying Action, and affected the equitable relations between the litigants in the matter before the court. (*Kendall-Jackson, supra*, 76 Cal.App.4th at p. 985.) This was sufficient evidence that the misconduct was directly related to the harm claimed by Kamarei and Moradi to satisfy the third prong of the *Blain* test. They were not required to additionally prove that the misconduct precipitated the Underlying Action, or that Moradi would have prevailed against Padideh on his cross-complaint in that action or that a different result than her favorable termination on the merits would have obtained absent her misconduct. To the extent *Kendall-Jackson* requires that the misconduct have " ' "prejudicially affect[ed] . . . the rights of the" ' " malicious-prosecution defendant " ' "so that it would be inequitable to grant such relief" ' " to the malicious-prosecution plaintiff (*Kendall-Jackson*, *supra*, 76 Cal.App.4th at p. 979), this degree and type of prejudice or harm is already incorporated into the third prong of the *Blain* test. It is met if, as here, the misconduct is shown to have occurred in a transaction

36

or matter directly related to and infecting the one presently before the court, and that it has affected the equitable relationship between the litigants. (*Kendall-Jackson, supra*, 76 Cal.App.4th at p. 984; *Pond, supra*, 151 Cal.App.3d at p. 290.) No further prejudice or harm is required.

## DISPOSITION

The judgment as to respondent Kamarei is affirmed. Kamarei is entitled to costs on appeal. (Cal. Rules of Court, rule 8.278(a)(2).) The appeal as to respondent Moradi is dismissed, with each party bearing its own costs on appeal, and we direct the immediate issuance of the remittitur as to respondent Moradi, only. (Cal. Rules of Court, rules 8.244(c) & 8.278(a)(5).)

_____

WILLIAMS, J.*

WE CONCUR:

_____

BAMATTRE-MANOUKIAN, ACTING P.J.

_____

WILSON, J.

*Padideh v. Moradi, D.D.S., et al.*
H048130

---

* Judge of the Santa Clara County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Trial Court:                                Santa Clara County Superior Court
                                            Superior Court No.:  CV292889


Trial Judge:                                The Honorable
                                            Thang Nguyen Barrett


Attorneys for Plaintiff and Appellant       Sheuerman, Martini, Tabari &
Setayesh Padideh:                           Gravin

                                            Alan L. Martini


Attorneys for Defendants and                Marissella T. Prada
Respondents Ramin Moradi, D.D.S.,
et al.:

*Padideh v. Moradi, D.D.S.; et al.*
H048130